IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KASSIUS WILLIAMS, | ) | CASE NO.  1:20-cv-978 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR |
| vs. | ) | |
| | ) | |
| WARDEN LASHANN EPPINGER, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| Respondent. | ) | |
| | ) | |
| | ) | **REPORT & RECOMMENDATION** |

This matter is before the magistrate judge pursuant to Local Rule 72.2.  Before the Court is the

Petition of Kassius Williams ("Williams" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to

28 U.S.C. § 2254 (Doc. No. 1), the Answer/Return of Writ (Doc. No. 8), Williams' Traverse (Doc. No.

10), and Respondent's Reply (Doc. No. 11).  Williams is in custody at the Trumbull Correctional

Institution pursuant to journal entry of sentence in the case *State v. Williams*, Cuyahoga County Court of

Common Pleas, Case No. CR-17-615721-B.  For the following reasons, the undersigned recommends

that the Petition be DENIED.

## I. Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a

state court, factual determinations made by state courts are presumed correct unless rebutted by clear and

convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th

Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The Ohio Court of Appeals for the

Eighth Appellate District summarized the facts underlying Williams' conviction as follows:

> {¶ 3} Williams was charged with two counts of aggravated murder, four counts of murder, two
> counts of discharging a firearm at or near a prohibited premises, four counts of felonious assault,
> and one count of carrying a concealed weapon. All counts, except the carrying a concealed
> weapon charge, included one-, three-, and five-year firearm specifications as well as forfeiture

1

specifications for three handguns.

{¶ 4} The state alleged that on March 25, 2017, at approximately 1:30 p.m., Williams and his codefendants, Terrell Gray and Charles Walker, were seated in a black Volkswagen sedan at the corner of Woodland Avenue and Woodhill Road when they happened to see a red SUV traveling westbound on Woodland Avenue. Walker, who was driving the Volkswagen, chased the red SUV at a high rate of speed for several blocks. As the Volkswagen approached the red SUV, Williams and Gray fired several shots at it and continued to shoot at it as their vehicle passed the SUV. Williams continued to shoot at the SUV after the Volkswagen had passed it.

{¶ 5} A 15-year-old passenger in the red SUV, later identified as T.J.,[] sustained three gunshots to his head. The gunshots also caused 20 bullet defects in the red SUV. A stray bullet that missed the SUV traveled an estimated 1,400 feet, passed through David Wilder's windshield, and struck Wilder in his left eye. Wilder and T.J. both died as a result of their injuries. The incident was captured on surveillance cameras installed at various businesses along Woodland Avenue.

{¶ 6} Williams accidentally shot Gray's hand during the shooting, and Walker drove Gray to St. Vincent Charity Hospital for treatment immediately after the shooting. Williams and Gray left their guns in the car when they entered the hospital. Walker entered the hospital with his handgun on his person. Walker's gun was confiscated, and the other two guns were later recovered from Walker's car.

{¶ 7} The state claimed that evidence at Walker's trial showed that 36 rounds were fired at the SUV from the Volkswagen during the high speed chase, and that 29 of the rounds came from Williams's .40-caliber handgun. Seven rounds came from Gray's 9 mm handgun. All the spent shell casings found at the scene matched Williams's and Gray's guns. No shots were fired from the red SUV, and the occupants of the red SUV were unarmed. Cleveland police discovered that Gray and Williams purchased a gun the day before the shooting. Since both individuals were adults with no criminal records, they were legally permitted to possess the guns. Charles Walker had a concealed carry permit that expired less than a month prior to the shooting.

{¶ 8} Walker and Gray were both convicted following jury trials. Williams waived his right to trial and pleaded guilty to two counts of aggravated murder and two counts of felonious assault, which were amended to delete all the firearm specifications except for the three-year firearm specifications attendant to the aggravated murder charges. The remaining charges were dismissed. The court sentenced Williams to 30 years to life plus three years on the attendant firearm specifications on each of the aggravated murder charges alleged in Counts 1 and 2. The court ordered these sentences to be served consecutively for a total of 66 years to life in prison. The court also sentenced Williams to seven years on each of his felonious assault convictions to be served concurrently with each other and with the sentences on the aggravated murder convictions. Williams now appeals the trial court's judgment and raises four assignments of error. We consider some assignments of error out of order, and consolidate others, to avoid repetition.

*State v. Williams*, 2018-Ohio-5022, 2018 WL 6601897, at *1-2 (Oh. Ct. App. Dec. 6, 2018).

## II. Procedural Background

**A. Trial Court Proceedings**

On April 11, 2017, a Cuyahoga County, Ohio grand jury indicted Williams on two aggravated murder charges, R.C. 2903.01(A), each with one-year, three-year, and five-year firearm specifications and weapon forfeiture specifications; four murder charges, R.C. 2903.02(B), each with one-year, three-year, and five-year firearm specifications and weapon forfeiture specifications; two discharge of firearm on or near prohibited premises charges, R.C. 2923.162(A)(3), each with one-year, three-year, and five-year firearm specifications and weapon forfeiture specifications; four felonious assault charges, R.C. 2903.11(A)(2), each with one-year, three-year, and five-year firearm specifications and weapon forfeiture specifications; one improperly handling firearms in a motor vehicle charge, R.C. 2923.16(B), with one-year, three-year, and five-year firearm specifications and weapon forfeiture specifications; and one carrying concealed weapon charge, R.C. 2923.12(A)(2), with a weapon forfeiture specification.  Doc. No. 8-1 (Exhibit 1).  Williams, through counsel, pleaded not guilty.  Doc. No. 8-1 (Exhibit 2).

Prior to trial, Williams filed a motion to appoint an investigator, which the trial court granted, subject to a $500 cap without a good cause showing.  Doc. No. 8-1 (Exhibits 3, 4).

On October 11, 2017, pursuant to a plea agreement, Williams withdrew his not guilty plea and pled guilty to two counts of aggravated murder with three-year firearm specification charges and two counts of felonious assault with gun forfeiture specification charges; the state dismissed the remaining charges and specifications.  Doc. No. 8-1 (Exhibit 5).  The trial court accepted Williams' guilty pleas, ordered him to forfeit the gun, and ordered a pre-sentence investigation and psychiatric examination.  Doc. No. 8-1 (Exhibit 5).

On November 16, 2017, the trial court held a hearing and sentenced Williams to 30 years to life for each aggravated murder conviction, to be served consecutively; three mandatory prior and consecutive years for each firearm specification, and seven years for each felonious assault conviction, to

3

be served concurrently, for a total of 66 years to life in prison.  Doc. No. 8-1 (Exhibit 6).

**B. Direct Appeal**

On December 5, 2017, Williams, through new counsel, filed a notice of appeal in the Ohio Court of Appeals.  Doc. No. 8-1 (Exhibit 7).  Thereafter, he filed a notice of replacement appellate counsel, a motion for leave to file an amended appeal notice, and an amended appeal notice.  Doc. No. 8-1 (Exhibits 8, 9, 10).  The Ohio Court of Appeals granted Williams leave to amend his appeal notice.  Doc. No. 8-1 (Exhibit 11).  In his brief, he raised the following claims:

> 1. Appellant's guilty plea violates the Sixth Amendment right to the effective assistance of counsel as appellant repeatedly told the trial court that his lawyers were ineffective and the record shows a breakdown in the attorney-client relationship.
>
> 2. The plea must be vacated as it violated the Fifth Amendment right to due process where the record shows that appellant was confused, suggested that he had a mental health diagnosis, and potentially suffering from withdrawal from prescription drugs, and the trial court made no further inquiry on appellant's mental health condition.
>
> 3. The plea must be vacated as a matter of law because it was not intelligently, knowingly, and voluntarily made under the Ohio and the United States constitutions.
>
> 4. The consecutive sentences must be vacated as a matter of law because the court imposed consecutive sentences on two separate defendants before making findings required by *State v. Bonnell*, and without making findings for each defendant independently.

Doc. No. 8-1 (Exhibit 12). Williams, *pro se*, filed a motion to supplement his brief to add "two more error assignments" and "add the argument of the Ballistics test," which the Ohio Court of Appeals denied.  Doc. No. 8-1 (Exhibits 13, 14).

On November 1, 2018, the Ohio Court of Appeals overruled Williams' first, second, and third assignments of error but sustained his fourth error assignment, stating,

> {¶38} After imposing consecutive sentences and three years of mandatory post-release control, and after advising Williams and Walker of their appellate rights, the court stated, almost as an afterthought, that it had to make the findings required for the imposition of consecutive sentences. (Tr. 73.) The court then made the findings set forth in R.C. 2929.14(C), but failed to specify whether the findings applied to Walker's sentence, Williams's sentence, or both. These errors were likely the result of simultaneously imposing sentences on two defendants instead of

4

sentencing each defendant individually, which is the better practice.

{¶39} Moreover, the trial court made the findings after it had already imposed consecutive sentences on both defendants in violation of *Bonnell's* mandate that the findings be made prior to imposing consecutive sentences. Therefore, the imposition of consecutive sentences was contrary to law and must be vacated.

Doc. No. 8-1 (Exhibit 16); *State v. Williams*, 2018-Ohio-4426.  The court affirmed Williams' convictions but vacated his consecutive sentences and remanded to the trial court to consider if consecutive sentences were appropriate and, if so, to make the necessary statutory findings.  *Id.*

The state filed a motion to reconsider, Williams filed an opposition brief, and the state filed a notice of supplemental authority.  Doc. No. 8-1 (Exhibits 17, 18, 19).  On December 6, 2018, after reconsideration, the Ohio Court of Appeals vacated its November 1, 2018 decision and substituted it with a new judgment that overruled all of Williams' assignments of error and affirmed his convictions and sentences.  Doc. No. 8-1 (Exhibits 20, 21); *State v. Williams*, 2018-Ohio-5022.  The court wrote,

{¶41} … R.C. 2929.14(C)(4) is silent with regard to the procedure a trial court must follow in making the statutory findings. Nothing in R.C. 2929.14(C)(4) prohibits the trial court from making joint findings on multiple defendants at the same time. And "[t]here is nothing in R.C. 2929.14(C)(4) (or otherwise) that requires a trial court to articulate its findings supporting the imposition of consecutive sentences before announcing its decision to impose consecutive sentences at a sentencing hearing." *State v. Romanko*, 8th Dist. Cuyahoga No. 104158, 2017-Ohio-739, ¶ 19. We, therefore, find no error in the fact that the trial court made findings in support of consecutive sentences on both Williams and Walker simultaneously or in the fact that the court announced Williams's sentence before making those findings.

{¶42} Accordingly, the fourth assignment of error is overruled.

*Id.*

Williams, through counsel, filed a motion in the Ohio Court of Appeals to certify a conflict under Ohio App.R. 25 on this issue:

Does R.C. 2929.14(C) require a trial court to announce findings to justify consecutive sentences before imposing consecutive sentences?

Doc. No. 8-1 (Exhibit 22).  On February 1, 2019, the Ohio Court of Appeals determined that its decision

5

was in conflict with *State v. Mayberry*, 2014-Ohio-4706 (Oh. Ct. App. 2nd Dist.) and *State v. Elliston*, 2014-Ohio-5628 (Oh. Ct. App. 3rd Dist.); granted Williams' motion; and certified this issue to the Ohio Supreme Court as a conflict:

> Whether the trial court must make its finding in support of consecutive sentences before imposing consecutive sentences on an offender.

Doc. No. 8-1 (Exhibit 23).

Meanwhile, on December 20, 2018, Williams, through counsel, appealed to the Ohio Supreme Court.  Doc. No. 8-1 (Exhibit 24).  He raised the following claims in his jurisdictional memorandum:

> 1. Ohio Revised Code § 2929.14(C)(4) requires a trial court to announce findings before, not after, the imposition of consecutive sentences.
>
> 2. The constitutional right to due process requires a trial court to sentence criminal defendants individually and prohibits collectively sentencing multiple defendants.
>
> 3. The Fifth and Sixth Amendments of the United States Constitution impose heightened obligation on a trial court to inquire during a plea hearing when a defendant has a mental health diagnosis and the record shows a breakdown in the attorney-client relationship.

Doc. No. 8-1 (Exhibit 25).  Williams also filed a notice of his motion to certify a conflict pending in the Ohio Court of Appeals.  Doc. No. 8-1 (Exhibit 26).  On May 8, 2019, the Ohio Supreme Court declined to accept jurisdiction of Williams' appeal pursuant to S.Ct.Prac.R. 7.08(B)(4).  Doc. No. 8-1 (Exhibit 8).

On February 4, 2019, Williams, through counsel, filed a notice of certified conflict in the Ohio Supreme Court after the Ohio Court of Appeals had certified a conflict.  Doc. No. 8-1 (Exhibit 29).  On May 8, 2019, the Ohio Supreme Court determined that no conflict existed and dismissed the cause.  Doc. No. 8-1 (Exhibit 30).

## C. Federal Habeas Proceedings

On May 5, 2020, Williams, through counsel, filed a Petition for Writ of Habeas Corpus pursuant to § 2254.  Doc. No. 1.  He raised the following grounds for relief:

> **GROUND ONE:** The trial court violated the Fifth and Sixth Amendment rights of petitioner by

6

accepting a guilty plea without inquiring about petitioner's mental health, understanding of the plea, and the visible breakdown in the attorney-client relationship.

**GROUND TWO:** Petitioner is serving a felony sentence imposed in direct violation of the plain language Ohio statute, constituting a deprivation of the Fifth and Fourteenth Amendment right to due process.

Doc. No. 1, pp. 3, 4. Respondent filed an Answer (Doc. No. 8), Williams filed a Traverse (Doc. No. 10) and Respondent filed a Reply (Doc. No. 11).

### III. Legal Standard

#### A. Exhaustion and Procedural Default

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner must meet certain procedural requirements in order to have his claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to exhaust applies when state remedies are "still available at the time of the federal petition." *Id.* (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). In contrast, when state court remedies are no longer available, procedural default rather than exhaustion applies. *Id.*

**Exhaustion**. A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A). A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. 28 U.S.C. § 2254(b),(c); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)) ("Federal courts do not

have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state

courts"). A constitutional claim for relief must be presented to the state's highest court in order to satisfy

the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v.*

*Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). In order to satisfy the fair presentation requirement, a

habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts.

*McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). This means that the petitioner must present his

claims to the state courts as federal constitutional issues and not merely as issues arising under state law.

*See, e.g., Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th

Cir. 1987).

**Procedural default**. Procedural default may occur in two ways. *Williams*, 460 F.3d at 806.

First, a petitioner procedurally defaults a claim by failing "to comply with state procedural rules in

presenting [the] claim to the appropriate state court." *Id*. *In Maupin v. Smith*, the Sixth Circuit provided

four prongs of analysis to be used when determining whether a claim is barred on habeas corpus review

due to petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural

rule applicable to petitioner's claim and whether petitioner failed to comply with that rule; (2) whether

the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and

independent state ground on which the state can foreclose review of the federal constitutional claim; and

(4) whether the petitioner can demonstrate cause for failing to follow the rule and actual prejudice by the

alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If,

due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the

merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding

relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court,

8

and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id*. While the exhaustion requirement is satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review. *Williams*, 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered. *Coleman*, 501 U.S. at 750.

## B. Merits Review

In order to obtain habeas relief under 28 U.S.C. § 2254, a petitioner must show either that the state court decision (1) resulted in a decision contrary to, or involving an unreasonable application of, clearly established federal law as determined by the United States Supreme Court ("contrary to" clause); or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings ("unreasonable application" clause). 28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant a writ if the state court "arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or [based on] a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ "if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "Clearly established federal law" refers to the

holdings, not dicta, of the Supreme Court's decisions as of the time of the relevant state court decision, as well as legal principles and standards flowing from Supreme Court precedent. *Id*. at 412; *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). A state court is not required to cite Supreme Court precedent or reflect an awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006); *White v. Woodall*, 572 U.S. 415, 426 (2014) ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.") (emphasis in original).

In determining whether the state court's decision involved an unreasonable application of law, the court employs an objective standard. *Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "A state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

### IV. Analysis

### A. Ground 1 fails on the merits

In Ground 1, Williams argues that the trial court violated his Fifth and Sixth amendment rights

10

when it accepted his guilty plea without inquiring about his mental health, his understanding of the plea, and the visible breakdown in the attorney/client relationship.  Doc. No. 1, p. 3.  Respondent argues that Ground 1 fails on the merits.  Doc. No. 8, pp. 29-37.

The Ohio Court of Appeals separated Williams' claims into two sections—"guilty plea" and "ineffective assistance of counsel," an approach the undersigned adopts.

**1. Guilty Plea**

The Ohio Court of Appeals considered Williams' claim that the trial court erred when it accepted his guilty plea without inquiring about his mental health and that his plea was not knowing, intelligent, voluntary:

*A. Guilty Plea*

{¶ 9} In the second assignment of error, Williams argues his guilty pleas should be vacated because the trial court failed to inquire about his mental health condition even though he was confused, suffered from a mental health diagnosis, and was potentially suffering from withdrawal of prescription drugs at the time of the plea hearing. In the third assignment of error, Williams argues his guilty pleas should be vacated because he did not enter them knowingly, intelligently, or voluntarily. We discuss these assigned errors together because they are interrelated.

{¶ 10} In determining whether the defendant entered a plea knowingly, intelligently, and voluntarily, we examine the totality of the circumstances through a de novo review of the record. *State v. Spock*, 8th Dist. Cuyahoga No. 99950, 2014-Ohio-606, ¶ 7.

{¶ 11} Crim.R. 11(C) provides that a trial court must inform a defendant of certain constitutional and nonconstitutional rights before accepting a felony plea of guilty or no contest. The purpose of Crim.R. 11(C) is to convey relevant information to the defendant so that he or she can make an intelligent and voluntary decision regarding whether to plead guilty. *State v. Ballard*, 66 Ohio St.2d 473, 479-480, 423 N.E.2d 115 (1981).

{¶ 12} Before accepting a guilty plea in a felony case, Crim.R. 11(C) requires that the trial court conduct an oral dialogue with the defendant to ensure (1) that the plea is voluntary, with the understanding of the nature of the charges and the maximum penalty involved and, if applicable, that the defendant is not eligible for community control sanctions; (2) that the defendant understands the effect of his or her plea; and (3) that the defendant understands the constitutional rights he or she waives by pleading guilty, including the rights to a jury trial, to confront witnesses against him or her, to have compulsory process for obtaining witnesses in the defendant's favor, and to require the state to prove the defendant's guilt beyond a reasonable doubt at a trial at which the defendant cannot be compelled to testify against himself or herself. Crim.R. 11(C)(2)(a)-(c); *see, e.g., State v. Hussing*, 8th Dist. Cuyahoga No. 97972, 2012-Ohio-

4938, ¶ 18.

{¶ 13} Strict compliance by the trial court is required for the waiver of the constitutional rights set forth under Crim.R. 11(C)(2)(c). *State v. Veney*, 120 Ohio St.3d 176, 2008-Ohio-5200, 897 N.E.2d 621, ¶ 18. When the trial court fails to explain the constitutional rights set forth in Crim.R. 11(C)(2)(c), it is presumed the plea was entered involuntarily and is, therefore, invalid. *State v. Clark*, 119 Ohio St.3d 239, 2008-Ohio-3748, 893 N.E.2d 462, ¶ 31.

{¶ 14} With respect to the nonconstitutional rights described in Crim.R. 11(C)(2)(a), such as the right to be informed of the maximum penalty involved, substantial compliance with the rule is generally sufficient. *Veney* at ¶ 14, citing *State v. Stewart*, 51 Ohio St.2d 86, 92, 364 N.E.2d 1163 (1977). "Substantial compliance means that under the totality of the circumstances the defendant subjectively understands the implications of his plea and the rights he [or she] is waiving." *State v. Nero*, 56 Ohio St.3d 106, 108, 564 N.E.2d 474 (1990), citing *Stewart* at 92-93. "[A] slight deviation from the text of the rule is permissible; so long as the totality of the circumstances indicates that 'the defendant subjectively understands the implications of his plea and the rights he is waiving.'" *Clark* at ¶ 31, quoting *Nero* at 108.

{¶ 15} Furthermore, a trial court's failure to properly advise a defendant of his or her nonconstitutional rights will not invalidate a plea unless the defendant demonstrates prejudice. *Nero* at 108. The test for prejudice is whether the plea would have otherwise been made. *Id*.

{¶ 16} At the plea hearing, the trial court asked Williams if he was undergoing any psychiatric treatment. Williams did not indicate he was taking, or was prescribed, any psychiatric medication, but stated that he had post-traumatic stress disorder and had an individualized education program in school. He also stated that he "didn't learn as — as fast as other students." Therefore, despite Williams's statement to the contrary, there is no indication in the record that Williams was withdrawing from prescription drugs at the time of the plea hearing. Furthermore, there is nothing in the record to suggest that Williams had a psychiatric diagnosis that prevented him from understanding the proceedings.

{¶ 17} When asked whether Williams understood the plea proceedings, Williams replied: "I don't fully understand." On further questioning, Williams clarified: "I don't understand like a cop out or all that or, like, how much time." (Tr. 4-5.) Williams's trial counsel informed him that the trial court would explain everything to him as they proceeded through the hearing.

{¶ 18} The court began by explaining that Counts 1 and 2 of the indictment charged Williams with aggravated murder and that each count included one-, three-, and five-year firearm specifications. The court further explained that the firearm specifications carried additional prison time that had to be served prior to and consecutive to the base penalties for each count of aggravated murder. The court also described the potential penalties for aggravated murder, and Williams indicated that he "somewhat" understood these things.

{¶ 19} The court informed Williams that less than a complete understanding was not sufficient and again described the potential penalties. In response to Williams's questions, the court also explained the nature and function of the parole board, and Williams indicated that he understood

that part. (Tr. 7.)

{¶ 20} The trial court then reiterated that Williams was charged with two counts of aggravated murder and explained that, as amended, each of the charges included a three-year firearm specification because the state deleted the one- and five-year firearm specifications. The court again explained that the three-year firearm specifications required prison time to be served prior to and consecutive to the base penalty of 20 years to life, 25 years to life, or 30 years to life, or life without parole on each of the aggravated murder charges. Williams indicated that he understood these charges and penalties. (Tr. 8-9.) Following additional explanation on sentencing, Williams indicated that he also understood the nature of consecutive sentences. (Tr. 9, 14.)

{¶ 21} The trial court next explained that Williams was also pleading guilty to two counts of felonious assault and that he could be sentenced to "anywhere from two to eight years in prison in yearly increments and/or a fine up to $15,000" on those charges. (Tr. 9.) The court informed Williams that while the sentences on the felonious assault charges were not mandatory, the sentences on the aggravated murder charges were mandatory. Williams indicated he understood that mandatory means "you have to do that." (Tr. 10.) He also indicated he understood the fact that aggravated murder means that he "planned" it. (Tr. 11-12.) Thus, the record shows that Williams understood the charges and the potential penalties attendant to the charges to which he was pleading guilty.

{¶ 22} In accordance with Crim.R. 11(C), the trial court described the constitutional rights Williams was waiving by virtue of his guilty pleas, and Williams indicated that he understood those rights. (Tr. 12-13.) Indeed, Williams does not dispute that the trial court complied with Crim.R. 11(C). However, when the court asked whether any threats or promises had been made to induce his plea other than what had already been described in open court, Williams indicated he believed he would receive a 23-year prison term. The court responded: "No, that's not a guarantee." (Tr. 13.)

{¶ 23} Williams then changed the subject and asked: "What's a subpoena?" (Tr. 13.) After explaining the subpoena power to Williams's satisfaction, the court again asked Williams if any threats or promises were made to induce his plea, and reiterated that no particular prison term was guaranteed. Williams replied that no promises or threats had been made and that his comment about receiving "23 to life" referred to the court's earlier explanation of the potential prison terms in open court. (Tr. 14.) When asked whether Williams understood that the court could run his prison terms consecutively, Williams replied: "I understand." (Tr. 14.)

{¶ 24} The record shows that the trial court complied with all the requirements of Crim.R. 11 and that Williams understood the constitutional and nonconstitutional rights he was waiving by pleading guilty, the nature of the charges, and the potential penalties he could receive. Indeed, Williams was actively engaged in an appropriate dialogue and asked questions whenever he needed clarification. Although Williams indicated that he suffers from post-traumatic stress disorder and that he has some kind of learning disability, there is no evidence that these conditions interfered with his understanding of the proceedings. And as previously stated, there is nothing in the record to suggest that Williams was withdrawing from prescription drugs. Rather, the record shows that Williams entered his guilty pleas knowingly, intelligently, and voluntarily.

{¶ 25} Therefore, the second and third assignments of error are overruled.

*State v. Williams*, 2018-Ohio-5022, 2018 WL 6601897, at *2-4.

To be valid, a guilty plea must be voluntarily and intelligently made, "with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970); *Bradshaw v. Stumpf*, 545 U.S. 175, 182-183 (2005). A plea is voluntary if it is not induced by threats, misrepresentations, or promises, and the voluntariness of the plea is "determined only by considering all of the relevant circumstances surrounding it." *Brady*, 397 U.S. at 749, 755. A plea is intelligent when the defendant "was advised by competent counsel, he was made aware of the nature of the charges against him, and there was nothing to indicate that he was incompetent or otherwise not in control of his mental faculties." *Id*. at 756. In a federal habeas proceeding the state bears the burden of showing that the plea was valid, and, in general, does so by producing a transcript of the plea hearing. *Garcia v. Johnson*, 991 F.2d 324, 326 (6th Cir. 1993).

A defendant is considered competent to stand trial or enter a guilty plea when he has sufficient present ability to consult with a lawyer with a reasonable degree of rational understanding and a rational and factual understanding of the proceedings against him. *Godinez v. Moran*, 509 U.S. 389, 396, 399 (1993). A "court's failure to make a proper competency inquiry where there is substantial evidence of a defendant's incompetency violates due process by depriving the defendant of his right to a fair trial." *Mackey v. Dutton*, 217 F.3d 399, 411 (6th Cir. 2000) (citing *Pate v. Robinson*, 383 U.S. 375, 385-386 (1966); *Drope v. Missouri*, 420 U.S. 162, 172 (1975)). There are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed," but "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, [and] . . . even one of these factors standing alone may, in some circumstances, be sufficient." *Drope*, 420 U.S. at 180. The question

14

is "whether a reasonable judge, situated as was the trial judge, should have doubted the defendant's competency." *Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012). A state court's determination of competence is a factual finding due deference on federal habeas review; "Regardless of whether we would reach a different conclusion were we reviewing the case de novo, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary." *Id.* (quoting *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001)).

Williams argues that he did not understand his plea, the plea agreement, or his sentence. Doc. No. 1, pp. 3-4. He states, "During the plea colloquy…, Williams repeatedly indicated that he was confused by the plea agreement and the consequences of his plea." Doc. No. 10, pp. 6-7. For example, he states, when the trial court asked him if he understood the maximum possible penalties (20 to life, 25 to life, 30 to life, life without parole), he replied, "Somewhat, yes." Doc. No. 10, p. 7 (citing Doc. No. 8-1, p. 6, Transcript). But Williams ignores the trial court's response and the discussion that followed:

> Court: Now, it can't be somewhat. We've got to make sure you understand it. Can you…I have the option of imposing one of those sentences.
>
> Defendant: Right. I just want to—
>
> Court: 20 to life means you would see the parole board in 20 years after you had done a 3-year firearm specification. So you would see the parole board in 23 years or you might see the board in 28 years or you might see the board in 33 years, or you may never see the board.
>
> Defendant: All right. So—
>
> Court: Do you understand those penalties?
>
> Defendant: So the parole board, like, what are they? Like, who are they? Like, that's the people that—
>
> Court: Those are the people who will look at your prison record, they will have a hearing. They will notify victims; you'll be able to give a presentation. They'll listen to victim's representatives if they appear, and they will decide whether at that point in time you're an appropriate person for release from prison.
>
> Defendant: Okay. I understand that part.

15

Court:  Do you understand that?  Counsel, do you wish for me to clarify anything?  Mr. Filiatraut?

[Prosecutor] Mr. Filiatraut: No, Judge.  So long as the defendant understands, and his lawyers say that he understands.

Mr. Bruner:  We made it very clear to him what he's facing.  He understands.

Mr. McDonnell:  Your Honor, Mr. Bruner and myself have met with him together; we've met with him separately.  We've met with his father at least four, five different times.  I've spoken with his mother five or six times.  I know our client had conversations with both of his parents yesterday.

You were kind enough to allow us to have Mr. Williams in the courtroom with Mr. Bruner and myself so we could have a conversation with his father.  We appreciate that.  And then at some point, Mr. Bruner and I left and the two of them talked.

[Court]:  Do you agree with that sir?

Defendant:  Yes, your Honor.

Court:  Okay. Do you have any other questions?  I'll continue to go through and answer any questions you have.

Defendant:  No, your Honor.

Court:  I want to make sure you understand what we're doing.

Defendant:  I'm tryin'.  Yeah. I understand.

Court:  Do you wish to proceed?

Defendant:  Yes, proceed, your Honor.

Court:  So once again, Count 1 and Count 2, they charge you with aggravated murder.  As amended, there is a three-year firearm specification.  They're deleting the one-year firearm specification and the five-year drive-by shooting specification.

So, those two counts, the firearm specification, must be served prior to and consecutive to the base penalty of 20 to life, or 25 to life, or 30 to life, or life without parole.  Do you understand that?

Defendant:  Explain.  Your Honor, could you explain consecutive?

Court:  Yes.  In other words, I could impose separate penalties for Count 1.  And consecutive means after you serve one, you then serve the other penalty.

[Defendant]:  Okay.  I understand.

16

Court:  Alright.  Also, you are pleading guilty to Counts 11 and 12.  [Explains the 2-8 year penalties for felonious assault]  That's not mandatory prison time on those counts, although Counts 1 and 2 are mandatory.  Do you understand that?

Defendant:  Mandatory meanin' you have to do that; right?

Court:  You have to do the time on Counts 1 and 2.  Do you understand that?

Defendant:  Yes, your Honor.

Court:  [Explains mandatory post release control and what a violation would mean].  Do you understand that?

Defendant:  If you violate—if you violate, you have to go back to prison?

Court:  Yes.

Defendant:  I understand that part.

Court:  Okay.  So you understand the penalties and you understand what you're pleading to; correct?

Defendant:  I want to ask one question, your Honor, if that's okay.

Court:  Go ahead.

Defendant:  Umm…the aggravated murder, that's—that's—you have to plead to—I mean, you have to— ummm, that's the time you have to do; right?

Court:  Yes.  The minimum on those two counts are 23 years to life.

Defendant:  So—

Mr. Bruner:  Here, ask me.  [Discussion had off the record]

Court:  Do you have any questions?

Defendant:  Ummm, no sir.  I just want to ask one question.  I have to go down for aggravated murder, it's like aggravated murder, like planned to do, that's what that means?

Court:  Yes.  Yes.

Defendant:  I understand, your Honor.

Doc. No. 8-2, pp. 6-13.  After the trial court went over the rights that Williams was waiving and Williams

asserted that he understood he was waiving those rights, the court asked,

> Court:  Have there been any threats or promises made to you to induce this plea other than what's been stated here in open court?
>
> Defendant:  Ummm, I thought I could get promised 23 or something like that.
>
> Court:  No, that's not a guarantee.
>
> Defendant:  I had one question, your Honor.  What's a subpoena?
>
> [Court describes what a subpoena is and Defendant states he understands]
>
> Court:  Have any threats or promises been made to you?  You indicated 23 to life; that's not any guarantee whatsoever.
>
> Defendant:  No, your Honor.  All I heard was just, like, 23, 25, 28, 33—
>
> Court:  What I said here in open court?
>
> Defendant:  Yes.
>
> Court:  You understand I can run those consecutive, two separate sentences?
>
> Defendant:  Two separate, yeah.  I understand.

Doc. No. 8-2, pp. 14-15.

Williams' argument that he "repeatedly indicated that he was confused by the plea agreement and the consequences of his plea" is not borne out by the record, reproduced above.  The undersigned finds that Williams' allegations do not give rise to relief.  *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("The subsequent presentation of conclusory allegations unsupported by specifics [to attack a guilty plea hearing] is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.").

Next, Williams asserts that he had advised the Ohio Supreme Court, in his memorandum in support of jurisdiction (which that court denied), that "Cuyahoga County has a history of denying medical care to inmates."  Doc. No. 10, p. 8.  "Nevertheless," he writes, "the Eighth District found no

18

Constitutional problem with the plea …[regarding] the potential mental health issues."  Doc. No. 10, p. 9.
He points out that he advised the trial court at the beginning of the hearing that "he suffered from post-traumatic stress, is undergoing psychiatric treatment, and had a learning disability in his school."  Doc.
No. 10, p. 9.  He submits, "Some circuit courts have opined that a trial judge should inquire before
accepting a plea if there is reason to believe a defendant is on psychiatric drugs," citing *U.S. v. Nicholson*,
676 F.3d 376 (4th Cir. 2012)).  Doc. No. 10, p. 9.

First, as the Ohio Court of Appeals found, Williams stated during the plea hearing that he was not
taking medication.  Doc. No. 8-2, p. 4; *Williams*, 2018-Ohio-5022, ¶ 16.  He does not argue that that
finding was erroneous.  His assertion that the trial court "failed to inquire about the mental health
condition of Williams after he explained he had a psychiatric diagnosis, suffered from post-traumatic
stress, and may have been denied mental health care while in the Cuyahoga County jail" (Doc. No. 10, p.
10) is unavailing.  There is no evidence that Williams was denied mental health care while he was in
jail—indeed, Williams stated that he was receiving mental health treatment in jail.  The following
exchange occurred at the beginning of the plea hearing:

Court:  Are you undergoing psychiatric treatment?

Defendant:  Yes, sir.

Court:  For what?

Defendant:  I, ummm, I have posttraumatic stress disorder as far as bein' through like a lot of
stuff I been goin' through.  My house been shot up, it been shot up several times.  And also I been
strugglin' in school as far as I had a EIP, I didn't learn as—as fast as other students.

Court:  Do you understand what we're going here today?

Defendant:  No, sir.

Court:  You don't?

Defendant:  I don't fully understand.

19

Mr. Bruner:  Everything we went over, you don't understand?

Defendant:  I never been through—

Mr. Bruner:  Like what don't you understand?

Defendant:  I don't understand like a cop out or all that or, like, how much time.

Mr. Bruner:  He's going to go through it.

Doc. No. 8-2, pp. 5-6.  Thereafter, the court went through the counts Williams was pleading guilty to and the possible sentence he was facing and Williams, while asking pointed questions (which the trial court answered) stated that he understood, as reproduced, *supra*.  Williams has not shown that the Ohio Court of Appeals finding—"there is nothing in the record to suggest that Williams had a psychiatric diagnosis that prevented him from understanding the proceedings"—is erroneous or unreasonable.  *Franklin*, 695 F.3d at 447.

In sum, the undersigned finds that Williams has not shown that the Ohio Court of Appeals' factual finding—that Williams understood the rights he was waiving by pleading guilty, the nature of the charges, and the potential penalties he could receive—was unreasonable or that its decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  28 U.S.C. § 2254(d); *Brady*, 397 U.S. at 748.

**2. Ineffective assistance of counsel**

The Ohio Court of Appeals considered Williams' ineffective assistance of counsel claim:

*B. Ineffective Assistance of Counsel*

{¶ 26} In the first assignment of error, Williams argues his guilty pleas violate the Sixth Amendment right to the effective assistance of counsel. He contends his trial lawyers were ineffective because they failed to request more than $500 to hire an investigator and because they failed to demand a bill of particulars. Williams also argues the record demonstrates a breakdown in the attorney-client relationship.

{¶ 27} Under certain circumstances, ineffective assistance of counsel may constitute a manifest injustice warranting the withdrawal of a guilty plea. *State v. Montgomery*, 8th Dist. Cuyahoga No. 103398, 2016-Ohio-2943, ¶ 4. However, where a defendant enters a guilty plea, he or she waives

20

any claim of ineffective assistance of counsel, except to the extent that the ineffective assistance of counsel caused the defendant's plea to be less than knowing, intelligent, and voluntary. *State v. Williams*, 8th Dist. Cuyahoga No. 100459, 2014-Ohio-3415, ¶ 11.

> A defendant who has entered a guilty plea can prevail on a claim of ineffective assistance of counsel only by demonstrating (1) deficient performance by counsel, i.e., that counsel's performance fell below an objective standard of reasonable representation, that caused the defendant's guilty plea to be less than knowing, intelligent and voluntary and (2) that there is a reasonable probability that, but for counsel's deficient performance, the defendant would not have pled guilty to the offenses at issue and would have, instead, insisted on going to trial.

*Id*., citing *State v. Xie*, 62 Ohio St.3d 521, 524, 584 N.E.2d 715 (1992), and *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); *see also Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 28} As previously stated, Williams claims his trial counsel was ineffective because they failed to request more than $500 for an investigator and failed to request a bill of particulars. However, there is nothing in the record demonstrating that defense counsel needed more than $500. Had they needed more money, there is no reason to believe that they would not have requested it or that the trial court would have denied the request. Therefore, Williams cannot demonstrate that his trial counsel's performance was deficient or that he was prejudiced by counsel's failure to request more than $500 for an investigator. Nor can Williams demonstrate he was prejudiced by counsel's failure to demand a bill of particulars since the state filed a bill of particulars within its initial discovery responses.

{¶ 29} Williams nevertheless argues that a breakdown in the attorney-client relationship deprived him of his right to the effective assistance of counsel. Indeed, when the trial court asked if Williams was satisfied with his lawyers, he responded: "No, your Honor." (Tr. 14.) The trial court inquired as to the cause of his dissatisfaction, and Williams stated: "Sometimes y'all don't come see me, like, I mean, I need y'all to come see me, I be needin' extra help with, like, this situation." (Tr. 14.) On further questioning, Williams explained that he expected to see his lawyers every time he had a pretrial. Defense counsel informed the court that they reviewed every piece of discovery with Williams, discussed the case with him several times, and discussed the case with his parents.

{¶ 30} Further questioning revealed that Williams was disappointed that he did not receive his own copy of a motion served on defense counsel by the prosecutor that was labeled "Counsel Only." (Tr. 16.) Defense counsel explained that they reviewed the motion with Williams and explained it to him, but could not give him a copy. (Tr. 17.) The prosecutor advised the court that defense counsel were "diligent in their efforts to get discovery," and that the case involved "a large amount of surveillance video from different businesses along Woodland Avenue." (Tr. 17.) The state turned over 80 gigabytes worth of electronic discovery to defense counsel. (Tr. 17.)

{¶ 31} The trial court asked Williams if he understood the work his lawyers rendered on his

behalf, and he replied: "Yes, I understand, your Honor." The court continued: "So you're satisfied with them?" Williams replied: "I am, your Honor." (Tr. 18.) Therefore, rather than demonstrating a complete breakdown of the attorney-client relationship, the record reveals that Williams was simply displeased with his counsel because he could not possess a motion intended for "Counsel Only." And there is no evidence that Williams's displeasure impacted his lawyers' ability to prepare a defense. Moreover, as previously explained, the record shows that Williams entered his guilty pleas knowingly, intelligently, and voluntarily. Therefore, Williams cannot establish a claim for ineffective assistance of counsel.

{¶ 32} The first assignment of error is overruled.

*State v. Williams*, 2018-Ohio-5022, 2018 WL 6601897, at *4-6.

The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel in the context of guilty pleas.  *Hill v. Lockhart*, 474 U.S. 52, 58 (6th Cir. 1985).  A petitioner must show that counsel's representation fell below an objective standard of reasonableness and "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Id*. at 59.

In his petition, Williams states, "Petitioner repeatedly told the trial court that his lawyers did not show him documents he wanted to review, that the lawyers did not visit him, and that he did not understand why he had to plead guilty to aggravated murder."  Doc. No. 1, p. 3.  First, Williams does not identify any portion of the transcript in which he had stated that "he did not understand why he had to plead guilty to aggravated murder."  Thus, that argument is baseless.[1]  With respect to Williams telling the trial court that his lawyers did not show him documents he wanted to review, he does not challenge the Ohio Court of Appeals' finding that the document Williams was upset he didn't get to see was a "counsel only" document that his attorneys did not give him but had gone over with him.  Doc. No. 8-2,

---

[1]  In his Traverse, Williams writes, "At sentencing, the father of Williams suggested that his son was a victim of various criminals beating him and shooting at his car in other incidents, suggesting Williams may have believed the aggravated murder was actually to protect his own safety."  Doc. No. 10, p. 8.  Suggestions made by Williams' father at the sentencing hearing regarding why Williams may have committed aggravated murder does not show that Williams' plea was not knowing, voluntary, or intelligent.
.

pp. 17-18. Williams had also expressed frustration that counsel did not go over his motions with him "first when I asked for my motions" but agreed that he had thereafter seen the motions. Doc. No. 8-2, p. 17. Williams agreed that his counsel had done the best they could for him and that they were not required to see him every time he had a pretrial hearing. Doc. No. 8-2, p. 16.

Williams argues, "The trial court failed to inquire if there was a breakdown in the attorney-client relationship when trial counsel and Williams began disagreeing with each other over what was and what was not explained to Williams" (Doc. No. 10, p. 10) but does not identify transcript pages showing disagreements he had with counsel that should have prompted the trial court to inquire about a breakdown in their relationship. He points out that his counsel and counsel for his co-defendant both asked the trial court to appoint new counsel after sentencing and suggests that that was done "possibly because they acknowledged potential issues regarding ineffective assistance of counsel." Doc. No. 10, p. 6. The fact that Williams' counsel asked the trial court to appoint new appellate counsel for Williams (after the trial court raised the issue of new counsel in the event of an appeal) does not show that counsel was ineffective or that there was a breakdown in their relationship.

Williams cites *United States v. Marrero*, 651 F.3d 453, 479-480 (6th Cir. 2011), regarding "a trial court's lack [of] inquiries about a purported breakdown in the attorney-client relationship." Doc. No. 1, p. 3. *Marrero* is not persuasive for a number of reasons: Williams cites the dissenting opinion in that case; the Sixth Circuit decided the case on direct review and was not required to apply the deferential AEDPA standard; and, according to the dissent, the trial court did not consider the "surrounding circumstances and contentions of Defendant" and gave him a "false choice" of proceeding with counsel he did not want or *pro se*. *Marrero*, 651 F.3d at 479-480. Here, the trial count considered Williams' contentions, got to the bottom of his alleged dissatisfaction with counsel, and did not force him to proceed with counsel he did not want.

23

Williams' remaining arguments are without merit. He alleges that he said his attorneys "did not visit him to explain the plea deal" (Doc. No. 10, p. 7 (citing Doc. No. 8-2, pp. 15-16)) but he did not state that his attorneys did not visit him to explain the plea deal. He contends, "Williams and his defense attorneys repeatedly disagreed with each other about how often they discussed various issues." Doc. No. 10, p. 7 (citing Doc. No. 8-2, pp. 15-19)). That statement, too, is belied by the record. The undersigned finds that Williams has not shown that the Ohio Court of Appeals' finding—that the record did not show a complete breakdown in the attorney-client relationship—was based on an unreasonable determination of the facts in light of the evidence presented to it or that its determination was contrary to Supreme Court precedent.

The undersigned finds that Ground 1 fails on the merits.

## B. Ground 2 is not cognizable

In Ground 2, Williams argues that the sentence imposed by the trial court is "in direct violation of the plain language Ohio statute" and violates his Fifth and Fourteenth Amendment right to due process. Doc. No. 1, p. 4. In his Traverse, he advises that Ground 2 is miscaptioned: his sentence is not in direct violation of an Ohio statute but is in direct violation of Ohio case law interpreting R.C. 2929.14(C)(4). Doc. No. 10, p. 11. He contends that *State v. Bonnell*, 16 N.E.3d 659 (Ohio 2014), interpreted R.C. 2929.14(C)(4) to require a trial court to make certain findings *before* imposing consecutive sentences. Doc. No. 10, p. 11. Because the trial court in his case imposed consecutive sentences and *then* made its findings, Williams argues that the Ohio courts "arbitrarily" decided not to apply *State v. Bonnell* to him, constituting a due process violation. Doc. No. 10, p. 14. Respondent argues that Ground 2 is not cognizable, procedurally defaulted, and fails on the merits. Doc. No. 8, pp. 37-45.

Federal habeas corpus relief is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *Wilson v. Corcoran*, 562 US 1, 5 (2010).

24

Williams' claim that his sentence is contrary to Ohio case law interpreting R.C. § 2929.14(C)(4) rests solely on state law and is not cognizable. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Thompson v. Bracy*, 2022 WL 676288, at *23 (N.D. Ohio Jan. 14, 2022) (claim that the trial court failed to make any findings pursuant to R.C. § 2929.14(C)(4) before imposing consecutive sentences rests on state law and is not cognizable).[2]

Williams writes, "Some federal courts have found challenges to state law criminal sentences cognizable in federal habeas—if the sentence was unauthorized by law, as explained in *Teneyuque v. Palmer*." Doc. No. 10, p. 11.  In *Teneyuque*, the court explained, "Claims which arise out of a state trial court's sentencing decision are not normally cognizable upon habeas review unless the petitioner can show that the sentence imposed exceeded the statutory limits or is wholly unauthorized by law."  2020 WL 1888828 at *8 (E.D. Mich. Apr. 16, 2020).  Williams does not allege that his sentence is beyond the statutory limits and it appears that his sentence is within those limits.  *See* R.C. § 2929.01(A).  Thus, Williams has to show that his sentence is "wholly unauthorized by law" to have a cognizable claim, *i.e.*, a federal constitutional violation occurred.  *Teneyuque*, 2020 WL 1888828, at *8.

Williams argues that a constitutional violation occurs when "a state court arbitrarily disregards its own procedures to unlawfully punish a criminal defendant" and submits that the Ohio Supreme Court and the Ohio Court of Appeals "arbitrarily deciding that *State v. Bonnell* does not need to apply to his case is a violation of his due process rights as protected by the Fifth and Fourteenth Amendments."  Doc. No. 10, p. 14.  Even if it could be said that Williams' claim is one that implicates fundamental unfairness such that a federal habeas court may review it if a constitutional violation occurred, Williams has not shown that a constitutional violation occurred.  He alleges that "*State v. Bonnell* is still controlling precedent from the Supreme Court of Ohio, except it arbitrarily does not apply to Kassius Williams" and

---

[2] Report and recommendation adopted, 2022 WL 911260 (N.D. Ohio Mar. 29, 2022).

submits, "The Eighth District continues to cite and apply *State v. Bonnell* in other cases. *See e.g., State v. Grayson*, 2019-Ohio-864." Doc. No. 10, p. 15. First, *State v. Grayson* does not support Williams' position; in that case, the Ohio Court of Appeals rejected the defendant's argument that the trial court did not consider one of the factors in R.C. 2929.14(C)(4) when sentencing him to consecutive sentences because the record showed that the trial court did consider that factor. 2019-Ohio-864, 2019 WL 1222963, at *1-2. Next, *State v. Bonnell* does not require a trial court to state its findings prior to imposing consecutive sentences; it requires a trial court to make those findings "at the sentencing hearing and incorporate its findings into its sentencing entry." 16 N.E.3d 659, 667 (Ohio 2014). Here the trial court made its findings "at the sentencing hearing." Thus, the Ohio Court of Appeals' decision—that "nothing in R.C. 2929.14(C)(4) (or otherwise) requires a trial court to articulate its findings supporting the imposition of consecutive sentences before announcing its decision to impose consecutive sentences at a sentencing hearing"—is not contrary to *Bonnell*. *Williams*, 2018 WL 6601897, at *7.

Furthermore, when the Ohio Supreme Court rejected Williams' appeal and his request to certify a conflict between his case and two other cases in two different districts because "no conflict exists," it did not "arbitrarily" apply *Bonnell* or R.C. 2929.14(C)(4) to his case. Doc. No. 8-1, p. 13. Neither case cited by Williams—*State v. Mayberry*, 2014-Ohio-4706 and *State v. Elliston*, 2014-Ohio-5628—was in conflict with his case; neither involved an Ohio appellate court ruling that a trial court must make its findings before it announces its decision to impose consecutive sentences. See Doc. No. 8-1, p. 262.

Thus, the undersigned finds that Williams has not shown that a federal constitutional violation occurred, and Ground 2, alleging a state law claim, is not cognizable.

## V. Conclusion

For all the reasons set forth above, it is recommended that the Petition be DENIED.


Date:  June 23, 2022                                    *s/ Jonathan Greenberg*
                                                        Jonathan D. Greenberg
                                                        United States Magistrate Judge



## **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).**